■ In the Matter of SHANTELLE W. SOCIETY FOR SEAMEN'S CHILDREN, Respondent; CHRISTINA W., Appellant.—In a proceeding pursuant to Social Services Law § 384-b to terminate the mother's parental rights, the mother appeals from an order of the Family Court, Richmond County (Meyer, J.), dated November 10, 1988, which, after a dispositional hearing, granted the amended petition, and terminated her parental rights.

Ordered that the order is reversed, on the law and the facts, without costs or disbursements, and the amended petition is dismissed.

The child which is the subject of this parental rights termination proceeding was born on August 29, 1981. She was placed in the care and custody of the petitioner, Society for

Seamen's Children, on July 24, 1986, as a result of a finding of neglect. In January 1988 the petitioner sought to terminate the parental rights of the natural mother on the ground that she had abandoned the infant within the meaning of Social Services Law § 384-b. In May 1988 the petitioner amended the petition to allege the additional grounds of permanent neglect and mental illness.

The amended petition alleged that since the date of the placement up to the filing of the amended petition, the mother had had minimal or sporadic contact with the infant and/or the agency, and that there had been protracted periods of time when she made no effort to contact the agency and/or visit the child. It was alleged also that she had not responded to the efforts of the agency to involve her in planning for the infant, that she had failed to keep appointments purposely scheduled for discussion and counselling which would lead to a recognition and resolution of the problems which led to the placement of the infant in the first place, and that she had failed to participate in counselling and/or parenting skills programs and/or psychotherapy and/or other rehabilitative programs "and has generally failed to cooperate with the diligent efforts made by the petitioner to encourage and strengthen the parental relationship".

The petition alleged further that the mother is mentally ill and, as a result, is unable and will not be able in the foreseeable future to care for the child, and that the child would be in danger of becoming a neglected child if she were returned to the mother.

At the fact-finding hearing, the court-appointed psychiatrist, Dr. Richard Hill, who had never met the mother other than for a "[n]early an hour" session, testified that he was of the opinion that the mother suffers from mental illness and that even if she enrolled in intensive therapy her condition is not likely to improve in the foreseeable future. This opinion contradicted the opinion of the petitioner's psychiatrist as expressed in his records that her condition may improve with intensive therapy. The petitioner's psychiatrist's records also showed that he had suggested that the mother become involved in intensive therapy and that her abilities as a parent and a caretaker be re-evaluated after one year. Dr. Hill's opinion also contradicted that which was expressed in the records of the Kingsboro Psychiatric Center where the mother was initially hospitalized, indicating that in the past she improved with medication.

The caseworker assigned to the case testified that the

mother regularly attended scheduled biweekly supervised visitations until February 1987. Thereafter, she failed to contact the agency until October 1987. On October 22, 1987, the mother failed to appear for a scheduled visitation. With respect to therapy, the caseworker testified that the mother did not produce any proof that she was involved in any psychotherapy, even though they discussed the topic on several occasions. The caseworker admitted, however, that although she mentioned the petitioner's psychiatrist to the mother, she never made a definite appointment for her.

The Family Court found that the agency had established both causes of action, i.e., permanent neglect and mental illness, by clear and convincing evidence, and granted the petition. We disagree with that finding and, therefore, reverse the order and dismiss the petition.

Dr. Richard Hill was the sole expert to testify at the fact-finding hearing. He testified that he diagnosed the mother as having "a mixed personality disorder" based upon his examination of her and his review of medical and hospital records. The medical records he referred to were the records of the petitioner's psychiatrist, Dr. Harvey Sonneblick. Dr. Hill evaluated the mother on June 23, 1988, and his report is dated July 8, 1988. Dr. Sonneblick's report, however, was dated July 14, 1988. When Dr. Hill was confronted with this fact, he explained that prior to the time he prepared his report, the caseworker read Dr. Sonneblick's report to him over the telephone. The explanation was not convincing and caused the Family Court to sustain the mother's attorney's objection and to deny the petitioner's application to have Dr. Sonneblick's report admitted into evidence through Dr. Hill. However, Dr. Hill was permitted to testify to his review of Dr. Sonneblick's report, and noted that it showed that Dr. Sonneblick diagnosed the mother as having a "possible schizophrenia". He then testified that he did not see any signs of schizophrenia during the time he interviewed the mother and, therefore, he would not diagnose her as having schizophrenia. Notwithstanding this observation, Dr. Hill testified somewhat confusingly that "the things that Dr. [Sonneblick] were saying were not really incompatible" with what he had seen in the mother. Dr. Hill's evaluation of the mother was that she was physically healthy and that her intellectual functioning was within normal range. His report referred to her as a person with a "rudimentary understanding of child care". When asked to explain what he meant, Dr. Hill stated: "She really understands the physical care of the child well enough, I

think, but that is about as far as it goes". He noted, however, that the mother was concerned for her child, showed appreciation of the proceedings, was not satisfied with efforts which the petitioner had made to reunite her with her child, and specifically complained that the petitioner was not permitting her to spend enough time with her child. Dr. Hill also noted that the mother had the ability to adequately care for the child's physical needs. Nevertheless, Dr. Hill was of the opinion that the mother's mental illness was not "amenable" to therapy, and that she would not be able to care for the child in the foreseeable future.

The Kingsboro Psychiatric Center report shows that the mother was diagnosed as having "atypical psychosis", but that during her stay at the hospital her agitated symptoms disappeared and she was assigned to a therapist. It also surfaced that Dr. Hill had only reviewed the Kingsboro records the same morning he testified. He, therefore, admitted the Kingsboro records had "nothing to do" with the conclusions which he reached. Thus, although Dr. Hill testified that his opinion was based on his evaluation of the mother and his review of medical and hospital records, it is clear that his opinion was based solely on the "[n]early an hour" that he met with the mother. Thus, Dr. Hill neglected to review the medical and hospital records and adamantly brushed aside all information indicating that the mother's mental condition improves with therapy and medication. Clearly, such evidence is not the kind that may be said to be clear and convincing with respect to her ability to care and provide for the child in the foreseeable future (see, Matter of Hime Y., 52 NY2d 282).

The petitioner also failed to establish by clear and convincing evidence that the mother permanently neglected her child. We make the preliminary observation that testimony adduced at a dispositional hearing is not to be used in determining whether or not a parent permanently neglected her child (see, Matter of Sheila G., 61 NY2d 368, 386). Consequently, the petitioner's reliance on evidence presented at the dispositional hearing is misplaced. "When a child-care petitioner has custody of a child and brings a proceeding to terminate parental rights on the ground of permanent neglect, it must affirmatively plead in detail and prove by clear and convincing evidence that it has fulfilled its statutory duty to exercise diligent efforts to strengthen the parent-child relationship and to reunite the family. Only when this duty has been deemed satisfied may a court consider and determine whether the parent has fulfilled his or her duties to maintain contact with

and plan for the future of the child" *(Matter of Sheila G., supra,* at 373). Thus, the threshold issue in a parental rights termination proceeding founded on permanent neglect is whether the petitioner discharged its statutory duty of exerting diligent efforts to reunite parent and child. The petitioner's duties, among other things, includes an ability to "determine the particular problems facing a parent with respect to the return of his or her child and make affirmative, repeated, and meaningful efforts to assist the parent in overcoming these handicaps" *(Matter of Sheila G., supra,* at 385).

At bar, it was established that the mother understood, and could adequately provide for, the physical needs of the child. The reason the child could not be returned to her was that she was mentally ill. The caseworker was assigned to this case approximately three days after she was employed. Significantly, this was her first employment as a caseworker and, indeed, the Family Court made the specific observation that "all tol[d] [she] is not the most experienced caseworker". Moreover, she never reviewed the Kingsboro psychiatric records to familiarize herself with the mother's history until after the petition to terminate the mother's parental rights was filed.

The caseworker's testimony, in substance, was that the mother was recalcitrant and always claimed that there was nothing wrong with her, or that she would seek the necessary psychiatric help herself. However, the caseworker never brought the allegedly recalcitrant behavior of the mother to the attention of the petitioner's psychiatrist, other than discussing the mother with him "in passing". The caseworker also admitted that although she discussed the mother's psychiatric problems with her, she, the caseworker, never made any definite appointment for the mother to meet the petitioner's psychiatrist.

While an agency is not charged with a guarantee that the parent succeed in his or her predicament, it must show that it had made "reasonable attempts" to remove that predicament *(Matter of Sheila G., supra,* at 385).

"Parents must themselves assume a measure of initiative and responsibility; they have a duty to plan for the future of their child, and a failure to utilize medical, psychiatric, psychological and other social and rehabilitative services and material resources will be taken into account in determining whether parents have in fact met their statutory responsibility * * *.

"But to fault parents for a lack of cooperation presupposes that the [petitioner] has fulfilled, or been utterly frustrated in its efforts to fulfill, its own statutory obligations to strengthen the parental relationship, including specifically a duty to provide 'services and other assistance to the parents so that problems preventing the discharge of the child from care may be resolved or ameliorated' " (Matter of Jamie M., 63 NY2d 388, 393-394, quoting from Social Services Law § 384-b [7] [f] [3]).

Under the circumstances of this case, the petitioner's efforts fell short of the reasonable efforts necessary to alleviate the mother's mental illness and fulfill its obligation to strengthen the parental tie between mother and child. Accordingly, we reverse the Family Court's finding, and direct the petitioner to take additional steps to assist the mother in overcoming her problems. In particular, we note that the agency should refer the mother for psychiatric therapy. After making such a referral and evaluating the mother's progress, the agency may take such future steps as it deems advisable. Thompson, J. P., Eiber, Pizzuto and Santucci, JJ., concur.